# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
### Case Number: 5:21-cv-00497

STEPHEN PAUL KREUZ,

                Plaintiff,

                                    COMPLAINT

v.

CAROLINA FINANCE, LLC,                JURY TRIAL DEMANDED
NC RECOVERY SERVICES, INC., and
MANHEIM REMARKETING, INC.

                    Defendants.

## I.    __INTRODUCTION__

1.    "The tenderest feelings of the human heart center around the remains of the dead." *Lamm v. Shingleton*, 231 N.C. 10, 15 (1949).

2.    For reasons unknown, the Defendants and their agents turned an unremarkable vehicle repossession into the theft and probable destruction of Plaintiff Stephen Kreuz's mother's remains, his Bible, and other valuable and significant items of personal property.

3.    This action is brought by Plaintiff Stephen Paul Kreuz against Defendants Carolina Finance, LLC, NC Recovery Services, Inc., and Manheim Remarketing, Inc. for violations of federal, state, and common law.

## II. **JURISDICTION**

4.  Jurisdiction arises under 28 U.S.C. §§ 1331, 1334, and 1367. *See Houck v. Substitute Tr. Services, Inc.*, 791 F.3d 473, 483 (4th Cir. 2015). Venue is proper as all relevant events occurred here.

## III. **PARTIES**

### A.  **Plaintiff Stephen Kreuz**

5.  Plaintiff Stephen Kreuz is an individual who generally resides in Raleigh, North Carolina. Mr. Kreuz was the debtor in the bankruptcy case *In re Kreuz*, 20-03229-5-SWH (Bankr.E.D.N.C.).

6.  Mr. Kreuz owns and drives a 2010 Dodge Ram (the "Vehicle"), which was and is his primary method of travel.

7.  Mr. Kreuz was a person concerning which a case under Title 11 of the United States Code had been commenced.

8.  At all times relevant hereto, Mr. Kreuz was a "debtor" as defined by 11 U.S.C. § 101(13).

9.  Mr. Kreuz was a natural person who incurred a debt or alleged debt for personal, family, household or agricultural purposes, *i.e.*, a debt for the purchase of a vehicle used for personal purposes.

10.    At all times relevant hereto, Mr. Kreuz was a "consumer" as defined by N.C.Gen.Stat. 75-50(1).

**B.    Defendant Carolina Finance, LLC**

11.    Defendant Carolina Finance, LLC ("Carolina Finance") is a limited liability company with its principal office located in Kinston, North Carolina.

12.    Carolina Finance had a claim against Mr. Kreuz that arose at the time of or before Mr. Kreuz filed his Voluntary Petition under Chapter 13 of the Bankruptcy Code.

13.    At all times relevant hereto, Carolina Finance was a "creditor" as defined by 11 U.S.C. § 101(10).

14.    Carolina Finance engaged, directly or indirectly, in debt collection from a consumer.

15.    At all times relevant hereto, Carolina Finance was a "debt collector" as defined by N.C.Gen.Stat. 75-50(3).

**C.    Defendant NC Recovery Services, Inc.**

16.    Defendant NC Recovery Services, Inc. ("NC Recovery") is a repossession company with its principal office located in Benson, North Carolina.

17.     NC Recovery engaged, directly or indirectly, in debt collection from a consumer.

18.     At all times relevant hereto, NC Recovery was a "debt collector" as defined by N.C.Gen.Stat. 75-50(3).

19.     At all times relevant to this Complaint, NC Recovery was acting as the authorized agent of Carolina Finance.

20.     Alternatively, NC Recovery was acting as an independent actor and without the knowledge or authority of Carolina Finance.

**D.     Defendant Manheim Remarketing, Inc.**

21.     Defendant Mannheim Remarketing, Inc. ("Manheim") is an auction company and provider of end-to-end wholesale vehicle solutions. Its clients include automotive dealerships to banks, car rental agencies and auto manufacturer.

22.     Manheim is a corporation organized under the laws of the State of Delaware, with its principal office in Atlanta, Georgia.

23.     Manheim has locations across the country, including four in North Carolina, one of which is in Kenly, North Carolina.

24.     Manheim engaged, directly or indirectly, in debt collection from a consumer.

25.     At all times relevant hereto, Manheim was a "debt collector" as defined by N.C.Gen.Stat. 75-50(3).

26.     At all times relevant to this Complaint, Manheim was acting as the authorized agent of Carolina Finance.

27.     Alternatively, Manheim was acting as an independent actor and without the knowledge or authority of Carolina Finance.

## IV.    FACTUAL ALLEGATIONS

28.     After their parents divorced when he was six years old, Mr. Kreuz and his sister moved with their mother Angela Pate to Watha, North Carolina.

29.     Ms. Pate had serious health problems for most of her life, beginning with a terrible back injury in her late teens, which worsened, leading to eleven herniated discs. She had high blood pressure, Type II diabetes, and, for the last decade of her life, chronic obstructive pulmonary disease. At the age of fifty-one, while laying in bed at home, she suffered a heart attack and passed away. Mr. Kreuz was twenty-six at the time of her passing.

30.     Ms. Pate did not leave a written authorization for the disposal of her body, as permitted by N.C.Gen.Stat. 130A-420(a).

31.     Ms. Pate did not have a surviving spouse. Therefore, her children were the sole persons authorized to determine the type, method, place, and disposition of her body. *See* N.C.Gen.Stat. 130A-420(b).

32.     Ms. Pate had discussed her wishes with her kids – Mr. Kreuz and his sister Kelly – several times over the years. She wanted to be cremated, with one-third of her ashes given each to Stephen and Kelly for each of them to choose what to do with. She wanted Stephen and Kelly to take the remaining third of the ashes and spread them on Mackinac Island.

33.     Mackinac Island was Ms. Pate's favorite place. She loved that no vehicles were permitted – only bicycles and horses. She had visited Mackinac several times, including with Mr. Kreuz's father. It reminded her of the movie, *Somewhere in Time*, and often made her think she was born too late and missed out on those simpler times.

34.     Mr. Kreuz and his sister instructed Riverview Crematory to split their mother's ashes into three portions.

35. Consistent with instructions from Mr. Kreuz and his sister, Riverview Crematory split Mr. Kreuz's mother's ashes into three bags and put them in into a black, plastic container.

36. The black, plastic container was well made. It had rigid sides, and a sturdy lid that closed on top. When held upside down, the lid did not open, nor did the bags fall out.

37. The North Carolina Administrative Code, Title 21, Chapter 34, Subchapter C, Section .0205, states:

> In addition to the requirements of G.S. 90-210.29A, the crematory or hydrolysis licensee shall attach a typed or printed label to the initial container, urn or other permanent container at the time the cremated or hydrolyzed remains are placed therein. If an inside and outside container are used, then both shall be labelled [sic]. The label shall contain the name of the decedent, the date of cremation or hydrolysis, and the name of the crematory or hydrolysis licensee.

21 N.C. Admin. Code 34C.0205.

38. Consistent with that Section of the NC Administrative Code, Riverview Crematory affixed a large label to the black, plastic container, which extended from the top over to the front side, and stated:

THIS CERTIFIES
the cremated remains in this
container are those of
**Angela Marie Pate**
Cremation # 852   Date of Death 12/4/2016
Date of Cremation   12/7/2016
**Riverview Crematory**

39.     Although they had never themselves been to Mackinac Island, Mr.
Kreuz and his sister wanted to fulfill their mother's wishes and spread a third of
her ashes there. In addition to fulfilling her wishes, they knew that they would
feel closer to their mother by spending time together at her favorite place and
spreading her ashes. Unfortunately, Mr. Kreuz's sister had not been able to travel
since moving and so Mr. Kreuz retained the third of their mother's ashes that she
had desired to be spread over Mackinac Island.

40.     Mr. Kreuz also had the other third of his mother's ashes for which
she had intended he decide what to do with. He had planned to utilize the
services of one of the unique companies that turns human ashes into jewelry. He
had planned to give these pieces of jewelry to his nieces – his sister's daughters;
his mother's granddaughters.

41.     Mr. Kreuz and his sister carefully cut the label so that she could take
one of the bags of their mom's ashes with her when she moved to Montana. The

label remained legible after they cut the label. Mr. Kreuz retained the other two bags in the same container and maintained possession of them until his Vehicle was repossessed.

42.     Mr. Kreuz brought his mother's ashes with him everywhere he went.

43.     Several times, Mr. Kreuz drove to Ohio to see family, always bringing his mom with him.

44.     Another time, Mr. Kreuz flew with her to Montana to see his sister Kelly, who had moved there after their mother passed.

45.     During one of those trips to Ohio, Mr. Kreuz received a gift that brought meaning to him and helped him stay closer to his mother in the years since her passing.

46.     When he visited family in Ohio, he always made a point to attend worship at a church in the area. Although he did not live there, he and many of the parishioners came to know each other quite well. He attended Bible study there any chance he could.

47.     During one visit – on his birthday – a pastor approached Mr. Kreuz, handed him the Bible, and told him that an anonymous parishioner wished to give it to him. It even had his name engraved on it.

48.     Mr. Kreuz had held onto that Bible ever since, reading it to help grow in his faith. He kept his favorite photo of his mother in it and used it as a bookmark. He loved being able to look at his mother while reading his Bible, to be with his mother while reading the Bible, to remind him why he was doing it – so that he could be with her again some day.

49.     The Bible and the photo of his mother were taken from him only because they were both in the Vehicle when it was repossessed and Defendants did not maintain or return them to him.

50.     On July 19, 2019, Mr. Kreuz and Inline Auto Sale Inc. entered into a Retail Installment Sale Contract that memorialized and controlled the relationship between Mr. Kreuz and Inline Auto Sale Inc. regarding the purchase and financing of the Vehicle, and which included the rights, duties, and responsibilities of each party to the contract ("the RISC"). Both Mr. Kreuz and an authorized agent of Inline Auto Sale Inc. duly signed the RISC.

51.     Each amount owed or contemplated to be owed under the RISC is a "debt" as contemplated by the North Carolina Debt Collection Act, N.C.Gen.Stat. § 75-50(2).

52.     Inline Auto Sale Inc., through an authorized agent, assigned without recourse its interest in the RISC to Carolina Finance.

53.     Upon accepting assignment of the RISC from Inline Auto Sale Inc., Carolina Finance was bound by its terms and in all instances required to comply with the duties and responsibilities previously imposed by the RISC on Inline Auto Sales Inc.

54.     The RISC stated:

> **3.     IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**
> ***
> **d.     We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it.
> ***
> If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.
>
> **e.     How you can get the vehicle back if we take it.** If we repossess the vehicle, you may pay to get it back (redeem). We will tell you how much to pay to redeem. Your right to redeem ends when we sell the vehicle.

> **f.    We will sell the vehicle if you do not get it back.**
> If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle.

RISC, p. 3, ¶¶ 3d, 3e, 3f.

55.    The RISC did not include as part of the collateral the personal property contained in the Vehicle.

56.    Mr. Kreuz did not consent, contractually or otherwise, to the incidental taking of his personal property.

57.    Mr. Kreuz has worked for MasTec for over two years, installing and servicing telephone and internet equipment inside people's homes.

58.    Due to the Covid-19 pandemic, there was a work slowdown and Mr. Kreuz was forced to find a second job. Mr. Kreuz began delivering pizzas in the Vehicle for Marco's and then for Domino's.

59.    Mr. Kreuz had been living with a roommate when the living situation became toxic in a way that, despite his best efforts, was beyond his control and he was forced to leave to protect himself from the problems caused by that situation.

60.    His Vehicle provided Mr. Kreuz with shelter to sleep and a locked and secure environment to store a modest number of personal possessions.

61.     At times, he was able to stay one or two nights during the week at a Best Western. Its accommodations allowed him to clean up periodically.

62.     On September 11, 2020, Mr. Kreuz had a rough day, including an argument with a co-worker. Despite having brought his mother's ashes with him into the Best Western every single time previously, this one time he hastily parked his truck and went inside to clean up and get some sleep. The next morning, Saturday, September 12, he awoke to find his truck gone. After calling 911, he concluded that it had been repossessed.

63.     That same day – Saturday, September 12 – Mr. Kreuz called Carolina Finance. Not able to reach anyone, he left a message.

64.     On Monday, September 14, 2020, Crystal with Carolina Finance called and left a message for Mr. Kreuz, and he returned her call the same day.

65.     During that telephone call, when Crystal asked Mr. Kreuz, "what can I do for you?" Mr. Kreuz, replied, "My truck was repossessed and I was just trying to see what I gotta do to be able to get it back, and my stuff that was in it, too."

66.     Crystal later stated, "Here's the telephone number to contact them in regard to try to recover your belongings" and provided the number, "919.607.5373." Mr. Kreuz read it back to her to confirm.

67.     The number provided to Mr. Kreuz by Crystal, 919.607.5373, is the number to NC Recovery.

68.     That same day, Mr. Kreuz called NC Recovery and spoke to a representative of NC Recovery.

69.     Mr. Kreuz told NC Recovery's representative that he had several personal possessions in the Vehicle that he needed to get back. She told Mr. Kreuz that the Vehicle was located in Wilson, North Carolina, and that he would have to make an appointment to pick up his personal property in Wilson.

70.     Mr. Kreuz told NC Recovery's representative that he would call back to make an appointment after he arranged for transportation to Wilson.

71.     Over at least the following five days, Mr. Kreuz called NC Recovery daily, at different times during the day, to make an appointment to pick up his personal property. None of his calls were answered by NC Recovery, so he left several voice mails. Despite leaving several voice mails, no one from NC Recovery called him back.

72.     After five consecutive days of unreturned calls, Mr. Kreuz started to feel that NC Recovery was intentionally not returning his calls and worried that he would need to speak to an attorney.

73.     During his online research, Mr. Kreuz discovered the option of bankruptcy.

74.     During his online research, he also discovered that there were complaints online against NC Recovery, including on the website of the Better Business Bureau, and including a claim that personal property had been missing from a person's vehicle.

75.     Despite his repeated calls to NC Recovery – made after having told NC Recovery that he had personal property in the Vehicle that he needed to pick up – NC Recovery did not provide him the opportunity to recover that property, nor did it store those possessions as required by the RISC.

76.     NC Recovery obtained possession of the Vehicle while Mr. Kreuz's mother's ashes were still in the Vehicle.

77.     NC Recovery obtained possession of the Vehicle while Mr. Kreuz's personal property was still in the Vehicle.

78.     On September 24, 2020, Mr. Kreuz filed a Voluntary Petition under Chapter 13 of the United States Bankruptcy Code ("the Petition") in the United States Bankruptcy Court for the Eastern District of North Carolina. *In re Kreuz*, 20-03229-5-SWH (Bankr.E.D.N.C.). The Vehicle was listed on Schedules A/B, C, and D, indicating, among other things, that Carolina Finance held a security interest in the Vehicle. Docket # 1, pp. 16, 22, 26. All references to "Docket __" refer to those docket entries in *In re Kreuz*, 20-03229-5-SWH (Bankr.E.D.N.C.).

79.     Mr. Kreuz also included the Vehicle in his Statement of Financial Affairs for Individuals Filing for Bankruptcy, Docket # 1, p.10-11, ¶ 10, indicating that the Vehicle had been repossessed by the creditor Carolina Finance, and that a motion for turnover would be filed.

80.     The Vehicle was property of Mr. Kreuz's bankruptcy estate.

81.     Each item of personal property inside Mr. Kreuz's vehicle was property of Mr. Kreuz's bankruptcy estate.

82.     Mr. Kreuz filed a proposed Chapter 13 Plan that included a redemption of the Vehicle through payment in full of Carolina Finance's claim. Docket # 2, p. 2, ¶ 3.4.

83.     On the same day the Petition was filed – September 24, 2020 – Joe Nichols, an employee of Mr. Kreuz's attorney's office, called Carolina Finance and spoke with Chief Compliance Officer Harvey Kirk. Mr. Kirk added Mark Mocnik to the call, and stated that Mr. Mocnik had possession of the Vehicle. Mr. Nichols informed Messrs. Kirk and Mocnik of Mr. Kreuz's bankruptcy filing and his plan to redeem the Vehicle. Mr. Kirk stated that the vehicle may have already proceeded to auction. Mr. Nichols requested the auction/sale-related notices required by the Uniform Commercial Code. Mr. Kirk did not provide them.

84.     After the telephone call, on September 24, 2020, Mr. Nichols emailed to Messrs. Kirk and Mocnik a letter with the bankruptcy case number and other information, as well as Schedule D and Mr. Kreuz's proposed plan of repayment.

85.     On September 24, 2020, Mr. Kirk emailed Mr. Nichols, copying attorney Rebecca Leigh, stating that Carolina Finance would auction the vehicle.

86.     On September 25, 2020, Carolina Finance was formally served with Mr. Kreuz's proposed Chapter 13 Plan. Docket # 8.

87.     On September 26, 2020, the Bankruptcy Noticing Center served Carolina Finance via email with the Notice of Chapter 13 Bankruptcy Case. Docket # 9.

88. On September 29, 2020, Mr. Kreuz filed a Motion for Turnover, requesting, among other things, that Carolina Finance be ordered to turn over to him possession of the Vehicle. Docket # 12.

89. On September 29, 2020, Mr. Kreuz also filed a Motion to Expedite Hearing, which was granted by the Bankruptcy Court the same day. Docket # 10, 11.

90. On October 5, 2020, Carolina Finance filed a Response to the Motion for Turnover. Docket # 16.

91. In its Response to the Motion for Turnover, Carolina Finance admitted:

    A.    that Carolina Finance, through its agents, repossessed the Vehicle. Docket # 12, ¶ 6; 16, ¶ 3.

    B.    that, as of September 24, 2020, the Vehicle had not been disposed of. Docket # 12, ¶ 7; 16, ¶ 3.

    C.    that, despite having been served on September 26, 2020, via email with the Notice of Chapter 13 Bankruptcy Case, Carolina finance sold the Vehicle at action on September 28, 2020. Docket # 16, ¶ 21.

92. Carolina Finance attached to its Response to the Motion for Turnover the RISC, which reflected the same rights, duties, and responsibilities described and quoted *supra*.

93. On October 6, 2020, the Bankruptcy Court held a hearing on Mr. Kreuz's Motion for Turnover, at which his counsel Jason Watson and Carolina Finance's counsel Rebecca Leigh appeared.

94. At the hearing on October 6, 2020, Carolina Finance, through counsel, admitted:

> A. that on September 14, 2020, Carolina Finance received a telephone call from Mr. Kreuz during which he inquired as to, among other things, his personal property.
>
> B. that when Carolina Finance received a telephone call from Mr. Kreuz's attorney's office (after filing his bankruptcy petition), the Vehicle had not been sold yet.
>
> C. that NC Recovery was at all times acting as the agent of Carolina Finance.
>
> D. that Carolina Finance's "best information…it's gathered up into trash bags and disposed of; now, disposed of probably includes somebody throws the tools in the back of their truck."

95. At the hearing on October 6, 2020, regarding the whereabouts of Mr. Kreuz's valuable personal property that had been in the Vehicle at the time of repossession, the following exchange took place:

> Judge Humrickhouse:    "I don't think anybody is gonna throw away a generator, or a dehumidifier, or good cables/jumper cables, and a good tool box."

Counsel Rebecca Leigh: "We certainly speculated on that point as well...you know, is there somebody who stocks their pawn shop with what's taken out of vehicles at auction. But for our purposes, we have no information; again, we will certainly research it further, but our best information at this point in time is actually yes it's gathered up into trash bags and disposed of...now, disposed of probably includes somebody throws the tools in the back of their truck.

96.     On October 16, 2020, the Bankruptcy Court entered an Order for Turnover. Docket # 18.

97.     The Order for Turnover made, among others, the following factual findings:

    a.      "Carolina Finance, through its agents, repossessed the Dodge Ram and all personal belongings contained in the Dodge Ram from the Debtor pursuant to Chapter 25 of the North Carolina General Statutes; and that the Dodge Ram had not been disposed of as of the date of the filing of this Chapter 13 case on September 24, 2020."

    b.      "At the time Carolina Finance repossessed the Dodge Ram, the Debtor had his personal belongings contained inside the Dodge Ram including: Debtor's Mother's Ashes in a black rectangular container, Husky socket wrench, Tone generator, 30 shirts, 5 tan work pants, tool bag containing assorted tools including screw drivers, wrenches, and assorted small piece tools, 1 fan, 1 small dehumidifier/air cooler, paper copies of tax records and paystubs, other personal documents, 3 winter coats, 5 pairs of shorts, long yellow and black jumper cables, Holy Bible with Debtor's name engraved on it with a picture of Debtor's Mother used as a book mark, 10 pairs of underwear, 15 pairs of socks, 1 Carolina Panthers' hooded sweatshirt, DC to AC power converter, 2 auxiliary cables, 3 micro USB cables, 3 car charging USB plugs, and approximately $20 in change."

c.     "The proposed Chapter 13 plan in this case provides for the full redemption of the debt due to Carolina Finance as required by N.C. Gen. Stat. section 25-9-623 (formerly N.C. Gen. Stat. section 25-9-506), whereby Carolina Finance is adequately protected."

d.     "The recovery of the Dodge Ram and the Debtor's Personal Belongings is essential to the rehabilitative purpose of this Chapter 13 case and also the fresh start benefit of bankruptcy; and that as a consequence of having lost the possession and use of the Dodge Ram and the Debtor's Personal Belongings, the Debtor is suffering immediate and irreparable injury, loss, and damage."

e.     "Therefore, just cause exists to compel said creditor to immediately turn over the Dodge Ram to the Debtor and to make all best efforts to recover and return the Personal Belongings to the Debtor."

Docket # 18.

98.     The Order for Turnover ordered:

> The motion of the Debtor be, and hereby is, granted, and that therefore, Carolina Finance is hereby ordered to immediately turn over possession of the Dodge Ram to the Debtor.
> ***
> Carolina Finance shall make all best efforts to recover and return the Personal Belongings to the Debtor with all parties not waiving their rights to pursue other damages or defenses at some later time.
>
> Carolina Finance shall be paid through the Chapter 13 plan as a secured creditor at full redemption value, provided that Carolina Finance files a valid Proof of Claim.

Docket # 18.

99.     Upon information and belief, Manheim obtained possession of the Vehicle while Mr. Kreuz's mother's ashes were still in the Vehicle.

100.     Upon information and belief, Manheim obtained possession of the Vehicle while Mr. Kreuz's personal property was still in the Vehicle.

101.     Upon information and belief, an employee or agent of Carolina Finance removed Mr. Kreuz's mother's ashes from the Vehicle.

102.     Upon information and belief, an employee or agent of Carolina Finance did not maintain Mr. Kreuz's mother's ashes.

103.     Upon information and belief, an employee or agent of Carolina Finance removed Mr. Kreuz's personal property from the Vehicle.

104.     Upon information and belief, an employee or agent of Carolina Finance did not maintain Mr. Kreuz's personal property.

105.     Upon information and belief and/or alternatively, an employee or agent of NC Recovery removed Mr. Kreuz's mother's ashes from the Vehicle.

106.     Upon information and belief and/or alternatively, an employee or agent of NC Recovery did not maintain Mr. Kreuz's mother's ashes.

107.     Upon information and belief and/or alternatively, an employee or agent of NC Recovery removed Mr. Kreuz's personal property from the Vehicle.

108.   Upon information and belief and/or alternatively, an employee or agent of NC Recovery did not maintain Mr. Kreuz's personal property.

109.   Upon information and belief and/or alternatively, an employee or agent of Manheim removed Mr. Kreuz's mother's ashes from the Vehicle.

110.   Upon information and belief and/or alternatively, an employee or agent of Manheim did not maintain Mr. Kreuz's mother's ashes.

111.   Upon information and belief and/or alternatively, an employee or agent of Manheim removed Mr. Kreuz's personal property from the Vehicle.

112.   Upon information and belief and/or alternatively, an employee or agent of Manheim did not maintain Mr. Kreuz's personal property.

113.   Since the entry of the Order for Turnover, no Defendant has provided any information to Mr. Kreuz or his attorneys regarding the whereabouts of his personal property, including his mother's ashes.

114.   Since the entry of the Order for Turnover, no Defendant has provided any information to Mr. Kreuz or his attorneys regarding their "best efforts to recover and return the Personal Belongings to the Debtor."

115.   After obtaining possession of the Vehicle after entry of the Order for Turnover, Mr. Kreuz observed that the Vehicle's door-locking mechanism

functioned at a level significantly lower than it had functioned prior to when one or more Defendants or their agents repossessed the Vehicle.

116.   After obtaining possession of the Vehicle after entry of the Order for Turnover, Mr. Kreuz observed that the Vehicle's door-locking mechanism was damaged, although it had not been damaged prior to when one or more Defendants or their agents repossessed the Vehicle.

117.   After obtaining possession of the Vehicle after entry of the Order for Turnover, Mr. Kreuz observed that the Vehicle's front axle functioned at a level significantly lower than it had functioned prior to when one or more Defendants or their agents repossessed the Vehicle.

118.   After obtaining possession of the Vehicle after entry of the Order for Turnover, Mr. Kreuz observed that the Vehicle's front axle is damaged, although it had not been damaged prior to when one or more Defendants or their agents repossessed the Vehicle.

119.   At no point in time did any of the Defendants contact Mr. Kreuz to advise him of the availability of the personal property inside his Vehicle nor any availability for him to remove or otherwise retrieve that personal property.

120. At no point in time did Mr. Kreuz have an opportunity to remove or otherwise retrieve his personal property from his Vehicle or from any Defendant that had possession of his personal property.

121. As of the time of this filing, Mr. Kreuz's personal property, including his mother's ashes, have not been returned by any Defendant.

122. Upon information and belief, one or more of the Defendants or their agents removed Mr. Kreuz's personal property from the Vehicle.

123. Upon information and belief, one or more of the Defendants or their agents disposed of Mr. Kreuz's personal property.

124. Upon information and belief, one or more of the Defendants or their agents retained possession of Mr. Kreuz's personal property.

125. Upon information and belief, one or more of the Defendants or their agents caused damage to the Vehicle's door-locking mechanisms.

126. Upon information and belief, one or more of the Defendants or their agents caused damage to the Vehicle's front axle.

127. Defendants violated their contractual duty to Mr. Kreuz to store his personal property, including his mother's ashes.

128.    As of the time of this filing, no information has been provided by Defendants or Attorney Leigh regarding what steps, if any, were taken by any of the Defendants to locate Mr. Kreuz's mother's ashes, his Bible, his mother's photograph, and his other personal property.

129.    Upon information and belief, one or more of the Defendants disposed of Mr. Kreuz's mother's ashes, despite them being in a container clearly labeled as containing human remains.

130.    Without yet knowing any additional information behind any of the Defendants' motivations to dispose of or retain possession of clearly labeled human remains, Mr. Kreuz cannot be sure if the Defendants initially withheld his mother's ashes in order to coerce him into paying the alleged balance on the vehicle loan.

131.    "[T]he holding of the body after the time for its cremation has passed, and claiming to hold it as a guaranty or as security for the payment of some indebtedness, is making a misuse of the body, just the same as its mutilation or improper burial." *Gadbury v. Bleitz*, 233 P. 299, 300 (Wash. 1925)

132.    In North Carolina:

It is a Class I felony, without authorization of law or the consent of the surviving spouse or next of kin of the deceased, to knowingly and willfully:

(1) Open, disturb, destroy, remove, vandalize or desecrate any casket or other repository of any human remains, by any means including plowing under, tearing up, covering over or otherwise obliterating or removing any grave or any portion thereof.

N.C.Gen.Stat. § 14-149(a).

133.    "[T]he burial of the dead is a subject which interests the feelings of mankind to a much greater degree than many matters of actual property. There is a duty imposed by the universal feelings of mankind to be discharged by some one towards the dead; a duty, and we may also say a right, to protect from violation; and a duty on the part of others to abstain from violation; it may therefore be considered as a sort of quasi property, and it would be discreditable to any system of law not to provide a remedy in such a case." *Floyd v. A. Coast Line Ry. Co.*, 83 S.E. 12, 12 (N.C. 1914) *quoting Pierce v. Proprietors of Swan Point Cemetery*, 10 R.I. 227, 237–38 (1872).

134.    "[T]he right to bury a corpse and preserve its remains is a legal right, which the courts will recognize and protect, and any violation of it will give rise to an action for damages." *Kyles v. S. Ry. Co.*, 61 S.E. 278, 280 (N.C. 1908). "Where the rights of one legally entitled to the custody of a dead body are violated by

mutilation of the body or otherwise, the party injured may in an action for damages recover for the mental suffering caused by the injury." *Id.*

135.    "Our law recognizes that the next of kin has a quasiproperty right in the body-not property in the commercial sense but a right of possession for the purpose of burial-and that there arises out of this relationship to the body an emotional interest which should be protected and which others have a duty not to injure intentionally or negligently. The rights of one legally entitled to its custody are violated if another unlawfully withholds the dead body from him…" *Parker v. Quinn-McGowen Co.*, 138 S.E.2d 214, 215–16 (N.C. 1964).

136.    "Burial rites or their counterparts have been respected in almost all civilizations from time immemorial. See generally *168 26 Encyclopaedia Britannica 851 (15th ed.1985) (noting that "[t]he ritual burial of the dead" has been practiced "from the very dawn of human culture and … in most parts of the world"); 5 Encyclopedia of Religion 450 (1987) ("[F]uneral rites … are the conscious cultural forms of one of our most ancient, universal, and unconscious impulses"). They are a sign of the respect a society shows for the deceased and for the surviving family members. The power of Sophocles' story in Antigone maintains its hold to this day because of the universal acceptance of the heroine's

right to insist on respect for the body of her brother. See Antigone of Sophocles, 8 Harvard Classics: Nine Greek Dramas 255 (C. Eliot ed.1909)." *Natl. Archives and Records Admin. v. Favish*, 541 U.S. 157, 167–68 (2004).

137.   "For any mutilation of a dead body the one entitled to its custody may recover compensatory damages for his mental suffering caused thereby if the mutilation was either intentionally or negligently committed, Morrow v. Southern R. R., 213 N.C. 127, 195 S.E. 383, or was done by an unlawful autopsy. If defendant's conduct was wilful or wanton, actually malicious, or grossly negligent, punitive damages may also be recovered." *Parker v. Quinn-McGowen Co.*, 138 S.E.2d 214, 216 (N.C. 1964). "…and punitive damages, also, if the jury find that such conduct was willful and wanton, or in reckless indifference to the rights and feelings of the plaintiff and to their own duties." *Kyles v. S. Ry. Co.*, 61 S.E. 278, 281 (N.C. 1908).

138.   "Other states, and other courts, have similarly recognized the rights and protections afforded by law to funerals and burials. See, e.g., Holland v. Metalious, 105 N.H. 290, 198 A.2d 654, 656 (1964) ("The right to 'decent' burial is one which has long been recognized at common law, and in which the public as well as the individual has an interest"); King v. Elrod, 196 Tenn. 378, 268 S.W.2d

103, 105 (1953) ("[T]he right to decent burial is well guarded by the law, and relatives of a deceased are entitled to insist upon legal protection for any disturbance or violation of this right." (citation omitted)); Koerber v. Patek, 123 Wis. 453, 102 N.W. 40, 43 (1905) ("We can imagine no clearer or dearer right in the gamut of civil liberty and security than to bury our dead in peace and unobstructed.... [N]one where the law need less hesitate to impose upon a willful violator responsibility for the uttermost consequences of his act."); cf. Snyder v. Phelps ——U.S. ——, ——, 131 S.Ct. 1207, 1227–1228, 179 L.Ed.2d 172 (2011) (Alito, J., dissenting) (explaining that "the emotional well-being of bereaved relatives is particularly vulnerable" at funerals because intrusions "may permanently stain their memories of the final moments before a loved one is laid to rest," and, as a result, "funerals are unique events at which special protection against emotional assaults is in order"); Nat'l Archives *276 & Records Admin. v. Favish, 541 U.S. 157, 167–70, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004) (noting that "[b]urial rites or their counterparts have been respected in almost all civilizations from time immemorial," and further noting that funerals "are a sign of the respect a society shows for the deceased and for the surviving family

members").” *Russ v. Causey*, 468 Fed. Appx. 267, 275–76 (4th Cir. 2012)(unpublished).

139.   Mr. Kreuz has suffered and been injured as a result of Defendants' and their agents' conduct.

140.   Defendants and their agents have caused Mr. Kreuz to be unable to carry out his mother's wishes as to the final disposition of her remains.

141.   Defendants and their agents have caused Mr. Kreuz to be unable to create the jewelry from his mother's remains that he had intended to give to his nieces (his mother's granddaughters).

142.   Each Defendant's and each of their agents' disrespectful treatment and disposal of Mr. Kreuz's mother's ashes is abhorrent and inconsistent with the sanctity with which any thoughtful person would treat human remains.

143.   Each Defendant's conduct and each Defendant's agents' conduct was inconsistent with the State of North Carolina's history of respect for human remains.

144.   Each Defendant's conduct and each Defendant's agents' conduct was inconsistent with the State of North Carolina's history of protecting those few persons legally permitted to fulfill the wishes of the departed.

145.   Each Defendant's conduct and each Defendant's agents' conduct offends established public policy of the State of North Carolina.

146.   Each Defendant's conduct and each Defendant's agents' conduct was and is immoral, unethical, oppressive, unscrupulous, unconscionable, and substantially injurious to consumers.

147.   Each Defendant's and each Defendant's agents engaged in conduct amounting to an inequitable assertion of their power or position.

148.   Each Defendant's conduct and each Defendant's agents' conduct demonstrates their reckless disregard for and indifference to the sanctity of Mr. Kreuz's mother's ashes, to Mr. Kreuz's rights with respect to the burial and ultimate disposition of his mother's ashes, and to their own responsibilities and duties to a person still grieving the loss of his mother, as clearly evidenced by his possession of her ashes.

149.   Each Defendant's conduct and each Defendant's agents' conduct demonstrates their reckless disregard for and indifference to Mr. Kreuz's rights and feelings.

150.   Each Defendant's conduct and each Defendant's agents' conduct demonstrates their reckless disregard for "all those emotions that men and

women hold for sacred in the disposition of their dead." *Mills v. Carolina Cemetery Park Corp.*, 86 S.E.2d 893, 898 (N.C. 1955).

151.   By withholding from Mr. Kreuz the personal property that had been in the Vehicle, Defendants and their agents exercised control over property of the bankruptcy estate and attempted to recover a claim against the debtor that arose before Mr. Kreuz's Petition was filed.

152.   By disposing of the personal property that had been in the Vehicle, Defendants and their agents exercised control over property of the estate.

153.   By retaining possession of the personal property that had been in the Vehicle, Defendants and their agents exercised control over property of the estate.

154.   By assuming and exercising the right of ownership over the personal property that had been in the Vehicle, Defendants and their agents exercised control over property of the estate.

155.   Defendants and their agents seized and refused to turn over Mr. Kreuz's personal property. Without authorization, they assumed and exercised the right of ownership over Mr. Kreuz's personal property to the exclusion of Mr. Kreuz's rights.

156. Mr. Kreuz had actual possession of his personal property at the time of Defendants' and their agents' trespass.

157. Mr. Kreuz had constructive possession of his personal property at the time of Defendants' and their agents' trespass.

158. Defendants and their agents unlawfully and without authorization interfered with Mr. Kreuz's property.

159. Defendants and their agents unlawfully and without authorization dispossessed Mr. Kreuz of his property.

160. At all times, Mr. Kreuz has had a right to present possession of the personal property that had been in the Vehicle.

161. At all times, Mr. Kreuz has had a right to immediate possession of the personal property that had been in the Vehicle.

162. Defendants and their agents caused Mr. Kreuz's property to be impaired as to condition, quality, and value.

163. Defendants and their agents caused Mr. Kreuz to be deprived of his personal property for a substantial period of time.

164. Defendants and their agents had no lawful excuse not to deliver Mr. Kreuz's personal property to him.

165.   "Conversion may occur when a valid repossession of collateral results in an incidental taking of other property, unless the loan agreement includes the debtor's consent to the incidental taking." *Eley v. Mid/E. Acceptance Corp. of N.C., Inc.*, 614 S.E.2d 555, 559 (N.C. App. 2005). *See also In re Randle*, 2018 WL 4211158, *3 (Bankr. M.D.N.C. Sep. 4, 2018) ("[T]he Defendant seized and refused to turn over personal property worth over $4,000.00 that was not its collateral, including a personal electric scooter that Mrs. Randle needed for her mobility."); *Rea v. Universal C.I.T. Credit Corp.*, 257 N.C. 639, 642 (1962) (plaintiff entitled to new trial on conversion claim when trial court failed to submit question to jury whether, at the time of repossession, plaintiff's car contained tools belonging to plaintiff); *Kitchen v. Wachovia Bank & Trust Co., N.A.*, 44 N.C.App. 332, 334 (1979) (denying lender's motion for summary judgment on issue of conversion when lender repossessed plaintiff's mobile home containing her personal property in which lender did not have security interest).

166.   It is not necessary to demand the return of personal property in order to show conversion. Indeed, "the general rule is that 'where some other independent act of conversion can be shown, there is no necessity for a demand for personal property by the person claiming ownership or right to possession,

and a refusal by the original taker thereof to deliver it, in order to show a conversion of the property.' 89 C.J.S. Trover & Conversion s 55 (1955). A demand and refusal is merely one means of showing a conversion; a demand and refusal is unnecessary when there has been a wrongful taking. Id." *Kitchen v. Wachovia Bank & Tr. Co., N.A.*, 260 S.E.2d 772, 773 (N.C. App. 1979).

167.   Each Defendant's conduct and each Defendant's agents' conduct, including their unlawful retention and disposal of Mr. Kreuz's mother's ashes, was extreme and outrageous.

168.   Each Defendant's conduct and each Defendant's agents' conduct, including their unlawful retention and disposal of Mr. Kreuz's mother's ashes, was so outrageous in character and so extreme in degree that it went beyond all possible bounds of decency.

169.   Each Defendant's conduct and each Defendant's agents' conduct, including their unlawful retention and disposal of Mr. Kreuz's mother's ashes, is atrocious and intolerable in a civilized community.

170.   Each Defendant's conduct and each Defendant's agents' conduct, including their unlawful retention and disposal of Mr. Kreuz's mother's ashes,

was intended to cause and did cause Mr. Kreuz to suffer severe emotional distress and mental anguish.

171.    Each Defendant's conduct and each Defendant's agents' conduct, including their unlawful retention and disposal of Mr. Kreuz's mother's ashes, was done with reckless indifference to the likelihood that severe emotional distress and mental anguish may result.

172.    Defendants and each Defendant's agents, when unlawfully retaining and disposing of Mr. Kreuz's mother's ashes, knew that severe emotional distress and mental anguish would be certain or substantially certain to result from their conduct.

173.    Defendants and each Defendant's agents, when unlawfully retaining and disposing of Mr. Kreuz's mother's ashes, acted recklessly in deliberate disregard of a high degree of probability that severe emotional distress and mental anguish would follow.

174.    Defendants and each Defendant's agents negligently engaged in conduct, including their unlawful retention and disposal of Mr. Kreuz's mother's ashes, when it was reasonably foreseeable that such conduct would cause Mr. Kreuz severe emotional distress and mental anguish.

175. Defendants and each Defendant's agents should have known that their conduct, including unlawfully retaining and disposing of Mr. Kreuz's mother's ashes, would cause Mr. Kreuz severe emotional distress and mental anguish.

176. Defendants' negligent conduct and the negligent conduct of each Defendants' agents proximately caused Mr. Kreuz to suffer severe emotional distress and mental anguish.

177. Plaintiff Stephen Kreuz demands a trial by jury of all claims.

## V.  COUNT I – AUTOMATIC STAY, 11 U.S.C. § 362

178. Plaintiff repeats, realleges, and incorporates by reference the foregoing paragraphs.

179. With actual notice of Mr. Kreuz's bankruptcy filing, Defendants and their agents attempted to recover a claim against the debtor that arose before Mr. Kreuz's Petition was filed by retaining his personal property that had been in the Vehicle at the time they repossessed it, in violation of 11 U.S.C. § 362.

180. With actual notice of Mr. Kreuz's bankruptcy filing, Defendants and their agents wrongfully exercised control over property of the estate by retaining

and/or disposing of his personal property that had been in the Vehicle at the time they repossessed it, in violation of 11 U.S.C. § 362.

WHEREFORE, Plaintiff Stephen Kreuz respectfully requests that judgment be entered in his favor against Defendants Carolina Finance, LLC, NC Recovery Services, Inc., and Manheim Remarketing, Inc., for:

1. Sanctions for willful violations of the automatic stay;

2. Actual damages for willful violations of the automatic stay;

3. Punitive damages for their willful violations of the automatic stay, for their conscious and intentional disregard of, and indifference to, the sanctity of Mr. Kreuz's mother's ashes and Mr. Kreuz's rights and feelings with respect to the burial and ultimate disposition of his mother's ashes, which Defendants knew would result in injury to Mr. Kreuz, and for their atrocious and intolerable conduct that went beyond all possible bounds of decency for a civilized community;

4. Costs and reasonable attorney fees for willful violations of the automatic stay; and

5. Such other and further relief as is just and proper.

## VI.    COUNT II – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

181.    Defendants' conduct and the conduct of each Defendant's agents, was extreme and outrageous, was intended to cause and did cause Mr. Kreuz to suffer severe emotional distress and mental anguish.

182.   Each Defendant's conduct and each Defendant's agents' conduct was so outrageous in character and so extreme in degree that it went beyond all possible bounds of decency.

183.   Each Defendant's conduct and each Defendant's agents' conduct is atrocious and intolerable in a civilized community.

184.   Each Defendant's conduct and each Defendant's agents' conduct was done with reckless indifference to the likelihood that severe emotional distress and mental anguish may result.

WHEREFORE, Plaintiff Stephen Kreuz requests that judgment be entered in his favor against Defendants Carolina Finance, LLC, NC Recovery Services, Inc., and Manheim Remarketing, Inc., for costs and actual damages, and for such other and further relief as is just and proper.

## VII.   <u>COUNT III – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>
(in the alternative)

185.   Defendants and each Defendant's agents negligently engaged in conduct when it was reasonably foreseeable that such conduct would cause Mr. Kreuz severe emotional distress and mental anguish.

186.   Defendants and each Defendant's agents should have known that their conduct would cause Mr. Kreuz severe emotional distress and mental anguish.

187.   Defendants' negligent conduct and the negligent conduct of each Defendants' agents proximately caused Mr. Kreuz to suffer severe emotional distress and mental anguish.

WHEREFORE, Plaintiff Stephen Kreuz requests that judgment be entered in his favor against Defendants Carolina Finance, LLC, NC Recovery Services, Inc., and Manheim Remarketing, Inc., for costs and actual damages, as well as such other and further relief as is just and proper.

## VIII.  <u>COUNT IV – UNFAIR OR DECEPTIVE ACTS OR PRACTICES</u>

188.   Each Defendant's conduct and each Defendant's agents' conduct was unfair and deceptive.

189.   Each Defendant's conduct and each Defendant's agents' conduct offends established public policy.

190.   Each Defendant's conduct and each Defendant's agents' conduct was immoral, unethical, oppressive, unscrupulous, unconscionable, and substantially injurious to consumers.

191.   Each Defendant's conduct and each Defendant's agents' conduct amounted to an inequitable assertion of their power or position.

WHEREFORE, Plaintiff Stephen Kreuz requests that judgment be entered in his favor against Defendants Carolina Finance, LLC, NC Recovery Services, Inc., and Manheim Remarketing, Inc., for actual damages, trebeled by N.C.Gen.Stat. § 75-16, costs, and attorney fees, as well as such other and further relief as is just and proper.

## IX.   <u>COUNT V – DETINUE</u>

192.   At the time that the Vehicle was repossessed and all times thereafter continuing through the present, Mr. Kreuz was entitled to immediate possession of the personal property that was in the Vehicle.

193.   Upon repossession of the Vehicle and continuing thereafter, Defendants and their agents were in actual possession of the personal property that was in the Vehicle.

194.   Upon demand, Defendants and their agents failed or refused and have continued to fail or refuse to deliver to Mr. Kreuz the personal property that was in the Vehicle.

WHEREFORE, Plaintiff Stephen Kreuz requests that judgment be entered in his favor against Defendants Carolina Finance, LLC, NC Recovery Services, Inc., and Manheim Remarketing, Inc., ordering a return of the personal property that was inside the Vehicle at the time of repossession, for costs and actual damages, and for such other and further relief as is just and proper.

## X.  COUNT VI – CONVERSION

195.  Defendants and their agents, without authorization, assumed and exercised the right of ownership over Mr. Kreuz's personal property that was in the Vehicle to the exclusion of the rights of Mr. Kreuz.

196.  Defendants and their agents wrongfully deprived Mr. Kreuz of his personal property.

197.  Mr. Kreuz did not consent, by contract or otherwise, to the incidental taking.

198.  No Defendant, nor any of their agents, had a security interest in the personal property that was in the Vehicle at the time of repossession.

199.  The Defendants' and their agents' repossession of collateral resulted in an incidental taking of Mr. Kreuz's personal property.

200.    Defendants and their agents have continued to possess Mr. Kreuz's personal property and/or have exercised control over his personal property by disposing of his personal property.

WHEREFORE, Plaintiff Stephen Kreuz requests that judgment be entered in his favor against Defendants Carolina Finance, LLC, NC Recovery Services, Inc., and Manheim Remarketing, Inc., for costs and actual damages, as well as such other and further relief as is just and proper.

## XI.    COUNT VII – TRESPASS TO CHATTEL

201.    Mr. Kreuz had actual possession of his personal property at the time of Defendants' and their agents' trespass.

202.    Mr. Kreuz had constructive possession of his personal property at the time of Defendants' and their agents' trespass.

203.    Defendants and their agents unlawfully and without authorization interfered with Mr. Kreuz's property.

204.    Defendants and their agents unlawfully and without authorization dispossessed Mr. Kreuz of his property.

205.    At all times, Mr. Kreuz has had a right to present possession of the personal property that had been in the Vehicle.

206.    At all times, Mr. Kreuz has had a right to immediate possession of the personal property that had been in the Vehicle.

207.    Defendants and their agents caused Mr. Kreuz's property to be impaired as to condition, quality, and value.

208.    Defendants and their agents caused Mr. Kreuz to be deprived of his personal property for a substantial time.

WHEREFORE, Plaintiff Stephen Kreuz requests that judgment be entered in his favor against Defendants Carolina Finance, LLC, NC Recovery Services, Inc., and Manheim Remarketing, Inc., for costs and actual damages, as well as such other and further relief as is just and proper.

## XII.    COUNT VIII – NORTH CAROLINA DEBT COLLECTION ACT

209.    Each Defendant and each Defendant's agent attempted to collect a debt from Mr. Kreuz

210.    Each Defendant and each Defendant's agent collected or attempted to collect a debt by means of any unfair threat, coercion, or attempt to coerce, in violation of N.C.Gen.Stat. § 75-51.

211.    Each Defendant and each Defendant's agent used any conduct, the natural consequence of which is to oppress, harass, or abuse any person in

connection with the attempt to collect a debt, in violation of N.C.Gen.Stat. § 75-52.

212.   Each Defendant and each Defendant's agent collected or attempted to collect a debt by use of unconscionable means, in violation of N.C.Gen.Stat. § 75-55.

213.   Each Defendant's conduct and each Defendant's agents' conduct offends established public policy.

214.   Each Defendant's conduct and each Defendant's agents' conduct is immoral, unethical, oppressive, unscrupulous, unconscionable, and substantially injurious to consumers.

215.   Each Defendant's conduct and each Defendant's agents' conduct amounted to an inequitable assertion of their power or position.

WHEREFORE, Plaintiff Stephen Kreuz requests that judgment be entered in his favor against Defendants Carolina Finance, LLC, NC Recovery Services, Inc., and Manheim Remarketing, Inc., for actual damages, trebled by N.C.Gen.Stat. § 75-16, civil penalties not less than five hundred dollars nor greater than four thousand dollars for each violation, costs, and attorney fees, as well as such other and further relief as is just and proper.

December 6, 2021                     LAW OFFICES OF JOHN T. ORCUTT, P.C.

/s/ Craig M. Shapiro
Craig M. Shapiro (State Bar # 48887)
Koury L. Hicks (State Bar # 36204)
Jeremy Harn (State Bar # 50756)
1738 Hillandale Road, Suite D
Durham, North Carolina 27705
(919) 286-1695
cshapiro@johnorcutt.com
khicks@johnorcutt.com
jharn@johnorcutt.com

ATTORNEYS FOR PLAINTIFF